**THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : |
| **v.** | : **3:19-CR-0113** |
| | : **(JUDGE MARIANI)** |
| **DORY L. SATER,** | : |
| | : |
| **Defendant.** | : |

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

Pending before the Court is Defendant Dory Sater's Motion to Suppress Statements ["Motion"]. (Doc. 33). Defendant has filed this Motion in order to suppress statements and any fruits of such statements which he alleges were obtained in violation of *Miranda. (Id.).*

A federal grand jury returned a two-count indictment on April 2, 2019, charging Defendant Dory Sater with attempted bank fraud in violation of 18 U.S.C. §§ 1344 and 1349, and aggravated identity theft in violation of 18 U.S.C. § 1028A. (Doc. 1). On April 11, 2019, Defendant was arraigned, appointed counsel and entered a plea of not guilty as to both counts. (Docs. 13, 14). On the same date, Defendant was released on his own recognizance. (Doc. 15).

Prior to Defendant's indictment on April 2, 2019 (Doc. 1),[1] "FBI agents interrogated

---

[1] Defendant's brief states the date of the encounter was March 1, 2019. (*See* Doc. 34, at 2). The agents do not state the year on the recording. (Doc. 34-1). During the suppression hearing, both FBI agents present for the interview testified the date was March 1, 2018. (*See, e.g.*, Hr'g Tr., at 7:1-4; 74:16-18).

Mr. Sater at or near his home, audio-recording the interrogation surreptitiously." (Doc. 34, at 1–2). Defendant alleges that this encounter was a "custodial interrogation," in which the FBI agents did not warn Defendant of his rights to silence and counsel. (*Id.* at 2). Defendant asserts he invoked his rights to silence and counsel, but the FBI agents continued to ask Defendant questions. (*Id.* at 2).

The Government asserts while speaking with the agents, Defendant "stood both within his residence and on the doorstep of his residence, with the door ajar, while the FBI agents stood on his front walkway and lawn." (Doc. 40, at 4). The Government asserts the FBI agents did not arrest Defendant or read him his *Miranda* rights. (*Id.*). The Government contends that, while Defendant said he did not wish to speak with the agents and that he did not wish to speak to them without counsel, he continued to speak with the agents anyway. (*Id.* at 4–5).

The recording of the conversation is approximately twenty-five minutes in length. (Doc. 34-1). At the beginning two people identify themselves as FBI agents to Sater. (*Id.* at 1:10-1:16). One agent asked Defendant, "So can we talk to you? Do you want to talk here?" Defendant replied, "Sure." The agent asked, "All right, outside?" Sater answered, "Yeah, please my wife is inside." (*Id.* at 1:28–1:35). After a few questions, the following exchange occurs:

> Defendant: I don't know if I should say anything at this point.
> Agent: Well, let me—let me explain something to you, so, we're just trying to get your side of the story.

> Defendant: I don't want to say anything at this point. I don't know enough to say anything.
> Agent: What do you mean you don't know? You either know or you don't know.
> Defendant: I don't want to say anything at this point. I don't know enough. I want to talk to my parents to see what's going on.
> Agent: So, you think maybe your parents filed a false satisfaction?
> Defendant: No, absolutely not.

(*Id.* at 4:50–5:17).

Defendant continued to speak with the agents and answered their questions for a few minutes before mentioning counsel:

> Agent: And, you wouldn't want to change your answer if I told you that there's video surveillance at that property, would you?
> Defendant: There's video surveillance at—? Yeah, if you have video surveillance I think I need to get a lawyer.
> Agent: You think? Or—
> Defendant: I mean if you're telling me that you've got all this stuff then I'm not gonna answer anymore questions, you know, without counsel.
> Agent: Ok.
> Defendant: I don't know what you have. I don't—all I know is I have a loan. They have a judgment. I'm still paying.

(*Id.* at 8:27–9:04).

The conversation continued for a few minutes when Defendant asked, "Can we do this another time?" (*Id.* at 10:48–12:08). The agent replied, "Well we could. I mean it would be better if we could get it resolved today." (*Id.* at 10:48–12:08). Defendant asked to see the satisfaction and continued to speak with the agents, asking "If I was—If I would've filed that, why would I be paying the loan?" and "If I was trying to commit a fraud, why would I do that? Why would I keep paying? Not miss a payment?" (*Id.* at 10:48–12:08). After about two more minutes of conversation, Defendant stated, "I would like to talk to you, but not when my wife

3

is [inaudible]. Can you come back in the afternoon?". The agents continued to ask him

questions. (*Id.* at 13:50–14:06). When Defendant again denied filing the satisfaction, the

agents referenced Sater's parents: "[T]hen we have to go to the next logical person and the

only other people that we know that would have any type of motivation to file a fraudulent

satisfaction would be the property owners, right? Maybe even more incentive than you." (*Id.*

at 16:04-16:28). At this point, Defendant confessed:

> Defendant: More than me. Yeah. Well, I'll tell you what happened.
> Agent: Ok.
> Defendant: All right. And—I filed it. And the only reason I did that was because my parents are so old school that they wanted their property—They wanted me to pay the loan. And I couldn't pay it in full. Right? So I did that so that they could forget about it because I intend to pay everything. I never intended to defraud anybody. I just wanted to give them something because they were freaking out that their house was attached.
> Agent: Did they know that it had been attached?
> Defendant: Yeah. But they wanted me to release it because they were thinking, at the time, of moving.
> Agent: So they wanted to sell it and now it's encumbered—
> Defendant: And I was going to pay it all. They're not going to move now.
> Agent: Ok.
> Defendant: Ok? And I wanted to just give them—You don't understand. My parents are old school. It was—my life was a living hell. I have two kids and they didn't want to come down to see the kids because they hated me, because according to them I was trying to steal their house. That's my dad's thinking. So I wanted to give him some peace of mind. And so I did that. Not intending to rip off the bank or anything like that. Just to, you know, I wanted to keep paying it. In fact, I have a big settlement, hopefully, coming and my idea was to pay it all off. And I'm broke right now. I don't have money to do that. I wish I could. And—And that's basically what happened. I don't want to lie to you.
> Agent: I appreciate that.
> Defendant: I feel terrible. And I did it. I mean. Look, I'm the son of immigrants, right? They were so proud of me for going out on my own. They supported me. And I just didn't manage my business well enough to be able to pay that off fast enough. And I was surprised by how the business—how expensive it was to

4

run a law firm. But they didn't understand that I wasn't taking their money. You know, like, I'm paying this. Nobody's going to take your house or anything like that. And they said that they just want the house. They just want peace of mind. I said, well, that's the motivation. And so I'm paying and I'm hopefully paying it all as soon as possible.

(*Id.* at 16:04–18:50).

The agents asked a few additional questions:

Agent: So it was you that went into the county?
Defendant: Yeah it was me.
Agent: And that was you that signed that document?
Defendant: I don't want to say anymore.
Agent: Did you have someone else sign it?
Defendant: I don't want to say anymore. No I didn't have anyone else sign it. I don't want to say any—
Agent: I mean—We're just—
Defendant: Listen I don't want to do this [inaudible]
Agent: Well we're not here to arrest you today—
Defendant: I know.
Agent: We're just trying to get your side of the story.

(*Id.* at 18:51–19:10).

Defendant made additional incriminating statements and continued to speak with the

agents for several more minutes before the agents departed.

On December 16, 2019, Defendant filed a Motion to Suppress Statements. (Doc.

33). The parties have fully briefed the Motion and it is ripe for decision. For the reasons set

forth below, the Court will deny Defendant's Motion. (Doc. 33).

5

## II. ANALYSIS

### A. *Miranda* Violations

The Fifth Amendment to the United States Constitution provides that no person

"shall be compelled in any criminal case to be a witness against himself." U.S. CONST.

amend. V. "[T]he privilege against self-incrimination protects individuals not only from legal

compulsion to testify in a criminal courtroom but also from 'informal compulsion exerted by

law-enforcement officers during in-custody questioning.'" *Pennsylvania v. Muniz*, 496 U.S.

582, 589, 110 S.Ct. 2638, 110 L.Ed. 2d 528 (1990) (quoting *Miranda v. Arizona*, 384 U.S.

436, 461, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966)). To ensure a person's Fifth Amendment

rights are protected, *Miranda* held that "the prosecution may not use statements, whether

exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it

demonstrates the use of procedural safeguards effective to secure the privilege against self-

incrimination." *Miranda,* 384 U.S. at 444. As a procedural safeguard, a person being

questioned must be issued the "*Miranda* warnings":

> Prior to any questioning, the person must be warned that he has a right to
> remain silent, that any statement he does make may be used as evidence
> against him, and that he has a right to the presence of an attorney, either
> retained or appointed.

*Id.*

"Police officers are not required to administer *Miranda* warnings to everyone whom

they question," even if the person is a suspect. *Oregon v. Mathiason*, 429 U.S. 492, 495, 97

S.Ct. 711, 714, 50 L. Ed. 2d 714 (1977). Police are only required to provide warnings when

6

a person is in custodial interrogation—"questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. "Because the presence of *both* a custodial setting and official interrogation is required to trigger the *Miranda* right-to-counsel prophylactic, absent one or the other, *Miranda* is not implicated." *Alston v. Redman*, 34 F.3d 1237, 1244 (3d Cir. 1994) (emphasis in original).

Under *Miranda,* interrogation refers "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). The focus of this inquiry is "upon the perceptions of the suspect, rather than the intent of the police." *Id.*

A person is "in custody" for the purposes of *Miranda* when there is a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983). "It is also established beyond doubt that a custodial interrogation may occur outside the police station." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (citing *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). In order for the Court to find a person was "in custody" absent a formal arrest, "something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which

indicates they would not have heeded a request to depart or to allow the suspect to do so."

*Leese*, 176 F.3d at 743.

The Third Circuit considers five factors in determining whether a person who has not

been arrested was in custody:

> (1) whether the officers told the suspect he was under arrest or free to leave;
> (2) the location or physical surroundings of the interrogation; (3) the length of
> the interrogation; (4) whether the officers used coercive tactics such as hostile
> tones of voice, the display of weapons, or physical restraint of the suspect's
> movement; and (5) whether the suspect voluntarily submitted to questioning.

*United States v. Willaman*, 437 F.3d 354, 359–60 (3d Cir. 2006). This analysis "depends on

the objective circumstances of the interrogation, not on the subjective views harbored by

either the interrogating officers or the person being questioned." *Stansbury v. California*, 511

U.S. 218, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994).

Once a custodial interrogation begins, if the suspect indicates he wishes to remain

silent, the interrogation must cease. *Miranda*, 384 U.S. at 474. Likewise, if the suspect

indicates he wants an attorney present, the interrogation must cease until an attorney is

present. *Id.*; *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d

378 (1981). Importantly, in order to invoke the *Miranda* right to counsel, "the suspect must

unambiguously request counsel." *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct.

2350, 2355, 129 L.Ed.2d 362 (1994). "[I]f a suspect makes a reference to an attorney that it

is ambiguous or equivocal in that a reasonable officer in light of the circumstances would

have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.*

If a suspect invokes his right to counsel, "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards*, 451 U.S. at 484–85. However, an interrogation can resume after a suspect invoked his Fifth Amendment rights, if "the accused himself initiates further communication, exchanges or conversations with the police." *Id.*; *see also United States v. Velasquez*, 885 F.2d 1076, 1087 (3d Cir. 1989). The initiation of further conversation "must evince a desire to discuss the case generally." *Velasquez*, 885 F.2d at 1087 (3d Cir. 1989).

If a suspect in custody is to be subjected to further interrogation after he invoked his Fifth Amendment rights, the prosecution must prove two factors are present indicating a waiver of the right to counsel. *Oregon v. Bradshaw*, 462 U.S. 1039, 1045, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983). First, the accused, not the police, needs to reopen the dialogue. *Id.* Second, the waiver of the right to counsel must be "knowing and intelligent and found to be so under the totality of the circumstances." *Id.* at 1046.

In this case, the parties dispute whether Defendant was "in custody" for purposes of *Miranda*. Because Defendant was not placed under arrest during this encounter (*See* Hr'g Tr., at 16:16-20; 27:24-25; 80:19-22), the Court herein analyzes whether Sater was in

9

custody using the *Willaman* factors. The Court finds that Defendant was not in custody during the interrogation for the purposes of *Miranda*.

First, the agents testified they did not tell Sater that he was under arrest, nor did they threaten to arrest him. (Hr'g Tr., Wentland Test., at 16:16-20; 27:24-25; Bailey Test., at 80:19-22). However, it was not until the end of the interview that the agents told Sater, "Well we're not here to arrest you today." (Doc. 34-1, at 18:54-19:10). *See Mathiason,* 429 U.S. at 495 (holding suspect was not in custody because he was "immediately informed he was not under arrest"). While they did not tell him that he was free to leave or that he did not need to answer their questions, this fact does not necessarily prove the interview was custodial. (Hr'g Tr., Wentland Test., at 17:3-4; 50:17–51:5; Bailey Test., at 81:7-8). *See United States v. King,* 604 F.3d 125, 138 (3d Cir. 2010) (finding a suspect was not in custody where the suspect was told he was not under arrest, but was not told he was free to leave). Therefore, the first factor does not weigh in favor of either side.

Second, the location of the interrogation was on the front doorstep of Defendant's home. (Hr'g Tr., Wentland Test., at 7:16). Neither agent entered Sater's home at any point during the interview. (*Id.* at 18:25–19:2; Bailey Test., at 83:3-5). An interrogation of a suspect "on his own turf," is "not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation." *Willaman*, 437 F.3d at 360 (quoting *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004)). The second factor suggests Defendant was not in custody.

Third, the interrogation was approximately twenty-five minutes in length. (*See* Doc. 34-1). The Third Circuit has held that interrogations lasting anywhere between ninety minutes to seven hours can be characterized as non-custodial. *United States v. Killingsworth*, 118 F. App'x 649, 651 (3d Cir. 2004) (collecting cases). The interrogation in this case was relatively short, suggesting Defendant was not in custody.

Fourth, the officers did not use any coercive tactics that would have created a custodial setting. Only two agents–Agent Wentland and Agent Bailey–interviewed Sater at his home around noon. (Hr'g Tr., Wentland Test., at 8:14-21). Both agents testified that they remained standing on the walkway leading to the porch and never stood on the porch, other than to ring the doorbell and hand Sater documents to read. (*Id.* at 15:2-4; 15:15-17; Bailey Test., at 77:17–78:3). The agents testified that they never physically restrained, frisked, or even touched Sater. (Hr'g Tr., Wentland Test., at 17:5-15; Bailey Test., at 81:9-17).

Regarding the tone of the conversation, Agent Bailey testified, and the recording confirms, "There was no escalating voices. No one was yelling or anything like that. I would say it stayed pretty calm and even throughout." (Hr'g Tr., at 82:7-14). Agent Wentland similarly testified, "It was professional. It was calm. There was no yelling. There were no threats made." (Hr'g Tr., at 18:6-9). Additionally, the agents honored Defendant's requests throughout the interview, such as when Sater asked the agents to speak with him outside (Doc. 34-1, at 1:30-1:35), to see the agents' credentials (*Id.* at 9:44-9:54), and to see the mortgage satisfaction that was filed (*Id.* at 11:12-11:45). The only request that they did not

honor was when Sater asked them to come back in the afternoon. (*Id.* at 13:55-14:02). *See Leese,* 176 F.3d at 744 (finding a suspect was not in custody where all of her requests were honored).

Furthermore, the agents testified they never displayed their weapons. (Hr'g Tr., Wentland Test., at 11:16-17; 13:11-13; Baily Test., 78:7-8; 80:15-18). Agent Wentland testified that his firearm was attached to his ankle and concealed by his pant leg. (*Id.* at 11:12–12:5). Agent Bailey testified that his firearm was located at his hip, but was concealed by his jacket. (*Id.* at 76:14-24). *Compare United States v. McNeil*, 416 F. App'x 227, 229 (3d Cir. 2011) (suspect was not in custody where officers' weapons were never drawn); *with United States v. Fautz*, 812 F. Supp. 2d 570, 619 (D.N.J. 2011) (suspect was in custody where agents entered with firearms drawn and continued to detain him with holstered, yet visible, weapons).

As to the final factor, Defendant voluntarily submitted to questioning. Agents Wentland and Bailey identified themselves as FBI agents immediately and explained that they wanted to ask Sater questions about a loan. When the agent asked, "So, can we talk to you? Do you want to talk here?" Sater responded, "Sure, sure." (Doc. 34-1, at 1:15–1:35). Agent Wentland testified that he never ordered Defendant to answer his questions nor prevented him from simply reentering his home and closing the door:

> Q. Did either of you ever order him to answer your questions?
> A. No.
> Q. Did you ever order him to come with you?
> A. No.

Q. Did you ever tell him he wasn't free to leave?

A. No.

[...]

Q. Was there ever a time that either you or agent Bailey blocked Dory Sater's ability to reenter his residence?

A. No.

Q. Was there ever a time that you or agent Bailey got between Dory Sater and the entrance to his residence?

A. No.

Q. And to your recollection, was there at any point any sort of physical barrier that prevented Dory Sater from closing his door when he was standing within the threshold of his residence?

A. No.

Q. Similarly, once Mr. Sater stepped out of the threshold of his residence, was there any physical barrier that prevented him from turning around and reentering his residence?

A. No.

(Hr'g Tr., at 16:24–18:5).

Agent Bailey likewise testified that Sater voluntarily answered their questions:

Q. At any point during the conversation, did you or agent Wentland order Dory Sater to answer your questions?

A. No.

Q. Did you ever order him to come with you?

A. No.

Q. Take him to a police station?

A. No.

Q. Did you ever tell him that he wasn't free to leave?

A. No.

[...]

Q. Was there ever a time during the conversation where you or agent Wentland blocked Dory Sater's ability to reenter his residence?

A. No.

Q. Was there ever a time you or agent Wentland got between Dory Sater and the door to his residence?

A. No.

Q. From what you could see, at any point in the conversation was there any physical barrier that prevented Dory Sater from closing his door in your face?

13

A. No.

Q. Any physical barrier that prevented him from reentering his residence after he had stepped down on that front platform?

A. No.

(Hr'g Tr., at 80:25–82:6).

Therefore, the final factor weighs in favor of a finding that Defendant was not in custody.

Having analyzed the interview through the *Willaman* factors, the Court finds that Defendant was not "in custody" for the purposes of *Miranda*. A reasonable person in the same circumstances would have felt free to simply reenter his home and close the door without answering any further questions. The facts here do not demonstrate that Sater was subject to the same inherently coercive pressures as if he were arrested and interrogated at the police station. Therefore, Defendant's constitutional rights were not violated when he was not advised of his rights to silence and counsel.

Defendant next argues that, despite not being advised of his rights, he invoked his right to silence and his right to counsel during the interview. The right to remain silent and the right to counsel pursuant to *Miranda* can only be invoked during a custodial interrogation:

> We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than "custodial interrogation"… The fact that we have allowed the *Miranda* right to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will allow it to be asserted initially outside the context of custodial interrogation, with similar future effect.

14

*McNeil v. Wisconsin*, 501 U.S. 171, 182 n.3, 111 S.Ct. 2204, 2211, 115 L.Ed.2d 158 (1991).

*See also Bobby v. Dixon,* 565 U.S. 23, 28, 132 S.Ct. 26, 29, 181 L.Ed.2d 328 (2011)

(holding a suspect who was not in custody during a chance encounter with the police could

not invoke *Miranda* rights); *Robertson v. Pichon*, 849 F.3d 1173, 1185 (9th Cir. 2017) ("But if

a defendant is not in the context of custodial interrogation…the safeguards of *Miranda* and

*Edwards* are inapplicable... even if the defendant had previously invoked *Miranda* and

*Edwards*"); *United States v. Hines*, 963 F.2d 255, 256 (9th Cir. 1992) ("[I]f [the suspect] was

not in custody during the first interview, the reference to his lawyer at that time cannot be

considered an invocation of *Miranda* rights."); *United States v. Cook*, 599 F.3d 1208, 1214–

16 (10th Cir. 2010) (holding the suspect's invocation of right to counsel irrelevant where the

suspect was not subject to a custodial interrogation).

The Supreme Court explained that in a noncustodial setting, the defendant "is in

control, and need only shut his door or walk away to avoid police badgering." *Montejo v.

Louisiana*, 556 U.S. 778, 795, 129 S.Ct. 2079, 2090, 173 L.Ed.2d 955 (2009). The

"inherently compelling pressures" that *Miranda* counteracts are not involved in a situation

that is non-custodial or non-interrogative. *Id.* (quoting *Miranda,* 451 U.S., at 490).

Defendant's argument assumes that he was "in custody" for the purposes of

*Miranda*. Having found that he was not "in custody," *Miranda* and *Edwards* do not apply.

Therefore, Defendant could not have invoked his right to silence or counsel.

## B. Voluntariness of Confession

Defendant additionally argues that his confession was involuntary and should be suppressed. This issue is not resolved simply because the Court has concluded he was not in custody for the purposes of *Miranda*. The Supreme Court has recognized that "noncustodial interrogation might possibly in some situations, by virtue of some special circumstances," cause a suspect's will to be overborne, leading to an involuntary confession. *Beckwith v. United States*, 425 U.S. 341, 347–48, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976); s*ee also United States v. Griggie*, 105 F. App'x 431, 434–35 (3d Cir. 2004) (holding involuntary confessions must be suppressed "regardless of whether an interrogation is custodial or noncustodial"). Even if an interrogation is noncustodial, the government still has the burden of proving, by a preponderance of the evidence, that the confession was voluntary.  *United States v. Swint,* 15 F.3d 286, 289 (3d Cir. 1994).

Due process requires a suspect's confession to be voluntary if it is to be admitted into evidence. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). A confession is involuntary if the suspect's "will was overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288, 111 S.Ct. 1246, 1253, 113 L.Ed.2d 302 (1991).

To determine the voluntariness of a confession, the Court must consider  "the totality of all the surrounding circumstances—both the characteristics of the accused and the

details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 434, 120 S.Ct. 2326,

2331, 147 L.Ed.2d 405 (2000).

> Those potential circumstances include not only the crucial element of police
> coercion; the length of the interrogation; its location; its continuity; the
> defendant's maturity; education; physical condition; and mental health. They
> also include the failure of police to advise the defendant of his rights to remain
> silent and to have counsel present during custodial interrogation.

*Swint*, 15 F.3d at 289 (internal citations omitted) (quoting *Withrow v. Williams*, 507 U.S. 680,

693–94, 113 S.Ct. 1745, 1754, 123 L.Ed.2d 407 (1993)). Moreover, "A suspect's

background and experience, including prior dealings with the criminal justice system, should

be taken into account in the voluntariness inquiry." *United States v. Jacobs*, 431 F.3d 99,

108 (3d Cir. 2005).

During the suppression hearing, the Government highlighted, among other factors,

Sater's law school education:

> At no point did this educated attorney who had the wherewith all [sic] to request
> to see documents, to request credentials and identity, who is clearly not under
> the influence of any controlled substance or alcohol, who wasn't surprised
> because this was a middle-of-the-day interview, at no point did that situation
> present a circumstance where his will was overborne by some sort of coercion.

(Hr'g Tr., at 92:20–93:1). *See Miller v. Fenton*, 796 F.2d 598, 606 (3d Cir. 1986) (finding a

mature adult with some high school education was "more resistant to interrogation than a

person who is very young, uneducated, or weak-minded"); *cf. Alston,* 34 F.3d at 1254

(finding 28-year-old defendant with a tenth grade education and three prior convictions was

able to "fully comprehend the serious situation" of his interrogation).

17

Additionally, the interrogation was approximately twenty-five minutes in length in front of his own home. Agent Wentland testified Defendant stood in the doorway of his home for the entirety of the interview with the door ajar. (Hr'g Tr., at 14:13-24). When asked what prevented Defendant from simply reentering his house and closing the door, defense counsel conceded, "There's no dispute they didn't do any—or take any physical action or threaten Mr. Sater with any physical repercussions." (Hr'g Tr., at 96:3-10). These factors suggest Defendant's will was not overborne.

During the suppression hearing, Defendant highlighted three additional actions taken by the agents, which he argues coerced his confession: the agent reading the false statements statute, the statement about "looking at" Sater's parents, and falsely implying the existence of incriminating video surveillance.

First, Defendant argues that the agent's reading of 18 U.S.C. Section 1001, which establishes the penalties for making false statements, "essentially flips *Miranda* on its head." (*Id.* at 95:8). Defendant contends that reading the statute "suggests a person essentially has to talk or has to continue talking" in order to exonerate himself for whatever statement he has already made. (*Id.* at 95:9–13).

While the Third Circuit has not addressed this exact issue, two circuits have held that reading the statute in order to admonish a suspect did not render a confession involuntary. *See United States v. Braxton,* 112 F.3d 777, 782 (4th Cir. 1997) (holding that informing a suspect during a noncustodial investigatory interview that "you can do five years because

you're not coming clean" did not "constitute coercive police conduct rendering a statement involuntary"); *Rivers v. United States*, 400 F.2d 935, 943 (5th Cir. 1968) (showing suspect Section 1001 during custodial interrogation "merely emphasized that if Appellant was going to say anything, he had best tell the truth. No one made any intimation that Appellant had a duty to speak or that the statute placed such a duty upon him"). Other circuits have held that accusing a suspect of lying to elicit further statements is not coercive enough to overbear a suspect's will. *Simmons v. Bowersox*, 235 F.3d 1124, 1133 (8th Cir. 2001); *United States v. Wolf*, 813 F.2d 970, 975 (9th Cir. 1987).

During the interview, after Defendant denied knowing about the filing of a satisfaction, the agent read and provided Defendant a copy of the statute:

> And I just want to make sure we're clear on this. So what I'm going to do is read to you 1001 Title 18 regarding false statements because I want to make sure that you're being truthful with me so I want to advise you of the fact that if you make a material omissions and false statements to us regarding this matter that that's punishable as well, ok? [...]
> So again I'm going to ask you. Think of it as an alibi. Are you aware of any type of satisfaction that was filed on the—"

(Doc. 34-1, at 2:02–3:12).

Later, when Defendant again denied involvement, the agent stated, "I hate to keep reminding you about Title 18 1001 where you're making false statements. Because let me tell you time after time after time cover up is always worse than the crime... It's where we usually get people." (*Id.* at 13:34–13:48).

19

Based on the persuasive authority from other circuits, the agent's statements do not amount to coercion. The agent's statements "Think of it as an alibi" and "It's usually where we get people" are sobering, and may even be intimidating, but do not deliver a threat and are not inherently coercive. The agents never told Sater he had to answer their questions, and reading Section 1001 does not communicate any duty to continue speaking with the agents. After careful review of the record evidence, the Court finds that reading Section 1001 to Sater did not cause Defendant's will to be overborne.

Second, Defendant argues that the agents' threats to investigate Sater's parents rendered his confession involuntary. The Third Circuit has not addressed whether threatening to arrest a suspect's family members overbears a suspect's will. Other courts have generally agreed that if there is probable cause to arrest the suspect's family member, the tactic is not coercive enough to render a confession involuntary. *Compare United States v. Hufstetler*, 782 F.3d 19, 24 (1st Cir. 2015) (finding officer's threat to arrest suspect's girlfriend was a "truthful description of the family member's predicament"); *and United States v. Johnson*, 351 F.3d 254, 263 (6th Cir. 2003) (admitting confession where probable cause to arrest suspect's family member existed); *and Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001) (finding confession voluntary where police had probable cause to arrest suspect's girlfriend who admitted to participating in the crime); *and Allen v. McCotter*, 804 F.2d 1362, 1364 (5th Cir. 1986) (finding confession voluntary where police had probable cause to arrest suspect's wife); *with Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct.

735, 5 L.Ed.2d 760 (1961) (finding coercion where police officer pretended to order the

arrest of suspect's ill wife); *and United States v. Finch*, 998 F.2d 349, 356 (6th Cir. 1993)

(finding confession involuntary where the police threatened to arrest suspect's family

without probable cause); *and United States v. Ortiz*, 943 F. Supp. 2d 447, 456–57 (S.D.N.Y.

2013) (suppressing confession where police threatened to arrest suspect's elderly aunt

without probable cause).

Here, the interview related to the filing of a false mortgage satisfaction on a property

owned by Defendant's parents. (Hr'g Tr., at 6:7-9). The agent told Sater, "So, right now, the

only interested parties that we can tell would be you and your parents…So if it's not you

then we're gonna have to go and…start looking at your parents." (Doc. 34-1, at 9:19-9:26).

Later, the agent reiterated, "And if what you're saying is that you can't answer that question,

then we have to go to the next logical person and the only other people that we know that

would have any type of motivation to file a fraudulent satisfaction would be the property

owners, right? Maybe even more incentive than you." (*Id.* at 16:00-16:19). Immediately after

the agent made this statement, Defendant confessed. (*Id.* at 16:20).

When asked about these statements, Agent Wentland testified, "I merely informed

him of what the next logical steps would be in our investigation." (Hr'g Tr., at 60:1-2). When

asked, "And when you're saying that you're going to go talk to his parents next, you meant

that you were going to speak to them about their potential involvement and criminal activity,

correct?" Agent Wentland replied, "Not correct. It was not to find out about their involvement

in criminal activity. It was just to obtain more information about this fraudulent mortgage satisfaction." (*Id.* at 61:8-14).

While arguably manipulative, the agents' statements regarding Sater's parents were not impermissibly coercive. The agents provided a truthful assessment of the next stages of the FBI's investigation. As owners of the property subject to the loan, the agents may have had probable cause to investigate Defendant's parents. Moreover, the FBI agents did not explicitly threaten to prosecute Sater's parents. Considering the totality of the circumstances, the agent's statements as to the next stages of their investigation do not allow this Court to find that Defendant's will was overborne when he admitted he filed the fraudulent mortgage satisfaction.

Finally, Defendant contends that when the agents implied they had video surveillance of Defendant committing the crime, they misrepresented the case in such a fundamental way that it coerced the confession.

A misrepresentation made to a suspect is relevant to the question of voluntariness. *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969). However, it does not render a confession involuntary in and of itself. *Id.* The misrepresentation of the strength of evidence against a suspect has often been held to be relevant, yet insufficient to demonstrate involuntariness. *Id.* (misrepresentation that co-defendant confessed did not outweigh other factors demonstrating voluntariness); *Velasquez*, 885 F.2d at 1088–89 (same); *United States v. Jacques*, 744 F.3d 804, 812 (1st Cir. 2014) (exaggerating strength

of evidence did not render confession involuntary); *Holland v. McGinnis*, 963 F.2d 1044,

1051 (7th Cir. 1992) (lying about existence of eyewitness "did not interject the type of

extrinsic considerations that would overcome Holland's will by distorting an otherwise

rational choice of whether to confess or remain silent"). However, a misrepresentation of the

law which makes it "impossible for the defendant to make a *rational* choice as to whether to

confess" is more likely to render the confession inadmissible. *United States v. Rutledge*, 900

F.2d 1127, 1129 (7th Cir. 1990) (emphasis in original). *See, e.g., United States v. Walton*,

10 F.3d 1024, 1031 (3d Cir. 1993) (false assurance that suspect's statements would not be

used against him rendered confession involuntary); *United States v. Lall*, 607 F.3d 1277,

1286 (11th Cir. 2010) (false promise not to prosecute defendant coerced confession);

*United States v. Bonner*, No. 1:09-CR-0072-02, 2010 WL 1628989, at *5 (M.D. Pa. Apr. 20,

2010), *aff'd*, 469 F. App'x 119 (3d Cir. 2012) (statements suppressed where officers falsely

implied defendant could speak freely).

During the suppression hearing, Agent Wentland admitted that he did not have any

video surveillance from the Luzerne County Courthouse, explaining, "It was a tactic I

thought might elicit the truth from him regarding whether he filed the mortgage satisfaction."

(Hr'g Tr., Wentland Test., at 26:2-8). Defendant argues that misrepresenting the existence

of "smoking gun evidence" coerces the suspect to confess as any challenge to video

surveillance would be futile. (Hr'g Tr., at 100:18–101:14). The agents' misrepresentations

regarding the existence of video surveillance is certainly a factor to consider in the

involuntariness analysis. However, that misrepresentation, without more, does not outweigh the factors that demonstrate voluntariness. Other courts have held that lying about the existence of such dispositive evidence did not necessarily make the interrogation coercive. *See Lucero v. Kerby*, 133 F.3d 1299, 1311 (10th Cir. 1998) (false statement regarding fingerprint evidence); *Ledbetter v. Edwards*, 35 F.3d 1062, 1069 (6th Cir. 1994) (false statement regarding a fingerprint match and two eyewitnesses); *United States v. Haynes*, 26 F. App'x 123, 134 (4th Cir. 2001) (fabricated ballistics report). Falsely implying that there was video surveillance does not support a finding that Sater's will was overborne.

Considering the totality of the circumstances, the Defendant's confession was voluntary. While reading Section 1001, repeatedly mentioning the suspect's parents, and falsely suggesting Sater was captured on video surveillance, may have some impact on the question of voluntariness, the Court cannot find that these circumstances rendered Defendant's confession involuntary. Sater's age and profession as an attorney combined with the fact that this noncustodial interview took place while Sater was standing in the doorway of his own home with the opportunity to end the conversation at any time, demonstrate the confession was voluntary.

## III. Conclusion

In conclusion, Defendant was not in custody for the purposes of *Miranda* during the March 1, 2018 interview at his home. Therefore, he could not invoke his Fifth Amendment right to silence or right to counsel. Moreover, Defendant's confession during the interview

was voluntary. For the foregoing reasons, this Court will deny Defendant's Motion to

Suppress Statements (Doc. 33) as set forth in this Memorandum Opinion.  A separate Order

follows.


_____
Robert D. Mariani
United States District Judge