THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA       :
                               :
       v.                      :   3:19-CR-0113
                               :   (JUDGE MARIANI)
DORY L. SATER,                 :
                               :
              Defendant.       :

## MEMORANDUM OPINION
### I. INTRODUCTION

Defendant Dory L. Sater's Motion for a Judgment of Acquittal (Doc. 110) and Motion

for a New Trial (Doc. 111) are pending before the Court.  Defendant filed these motions

following a six-day trial which resulted in a guilty verdict on all counts set out in the April 2,

2019, Indictment.  On November 10, 2020, a jury found Defendant guilty of Attempted Bank

Fraud or Bank Fraud pursuant to 18 U.S.C. §§ 1344(1) and 1344(2) and Aggravated Identity

Theft pursuant to 18 U.S.C. § 1028A.  (Doc. 104.)  The basis of this criminal action is

Defendant's filing of a false and fraudulent Mortgage Satisfaction Piece with the Luzerne

County Recorder of Deeds in August 2017 that stated falsely that a $50,000 mortgage held

by Fidelity Bank was satisfied and discharged in full.  (*See, e.g.*, Doc. 1 at 2.)  The mortgage

was on Defendant's parents' house and had been used, at Defendant's request, to secure a

$50,000 line of credit for Defendant's use.  At trial, the fact of the filing was not disputed.

Rather, Defendant contested the Government's assertion that his conduct violated the Bank Fraud statute and Aggravated Identity Theft statute.

Defendant first made a Motion for Judgment of Acquittal at the close of the Government's case on November 9, 2020. (Doc. 107.) After hearing oral argument on the same date, the Court denied the motion by oral order. (Doc. 113 at 147.) On November 16, 2020, Defendant filed the Motion for Leave to File Briefs No Later Than 14 Days After Receipt of Transcripts (Doc. 108) informing the Court that he intended to file a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 and motion for a new trial pursuant to Rule 33. (Doc. 108 at 1.) The Court granted Defendant's motion by Order of November 17, 2020. (Doc. 109.) Defendant timely filed the motions under consideration here on December 7, 2020. (Docs. 117, 110.) The motions are now fully briefed and ripe for disposition. (Docs. 117, 118, 122, 123, 126, 127.) For the reasons discussed below, the Court will deny Defendant's motions.

## II. ANALYSIS

### A. Motion for a Judgment of Acquittal

With the Motion for a Judgment of Acquittal, Defendant asserts that the Court should acquit him of Count 1 for Bank Fraud because the Government failed to admit evidence permitting a non-speculative inference that he schemed or acted with the intent to defraud Fidelity under 18 U.S.C. § 1344(1), that he knowingly executed a scheme to obtain Fidelity's money or property by means of material representations under 18 U.S.C. § 1344(2), or that

2

he attempted to do so. (Doc. 117 at 1.) Defendant further asserts that the Court should

acquit him on Count 2 for Aggravated Identity Theft because that conviction is dependent on

conviction for Count 1. (*Id.* at 1-2.) The Government responds that the jury had sufficient

evidence to determine that Defendant caused or intended to cause risk of loss to Fidelity

Bank (Doc. 122 at 13) and the jury had sufficient evidence to determine that Defendant's

scheme could obtain Fidelity Bank's Property by means of a false statement (*id.* at 19).

Federal Rule of Criminal Procedure 29 provides the following in pertinent part:

**(a) Before Submission to the Jury.** After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.

. . . .

**(c) After Jury Verdict or Discharge.**

**(1) Time for a Motion.** A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later.

**(2) Ruling on the Motion.** If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal. If the jury has failed to return a verdict, the court may enter a judgment of acquittal.

**(3) No Prior Motion Required.** A defendant is not required to move for a judgment of acquittal before the court submits the case to the jury as a prerequisite for making such a motion after jury discharge.

Fed. R. Crim. P. 29(a) and (c).

Under Rule 29, a defendant who asserts that there was insufficient evidence to sustain a conviction shoulders "a very heavy burden." *United States v. Anderson*, 108 F.3d 478, 481 (3d Cir. 1997) (quoting *United States v. Coyle*, 63 F.3d 1239, 1243 (3d Cir. 1995)). In reviewing a Rule 29 post-verdict motion for judgment of acquittal,

> a district court must "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Wolfe*, 245 F.3d 257, 262 (3d Cir.2001). The court is required to "draw all reasonable inferences in favor of the jury's verdict." *United States v. Anderskow*, 88 F.3d 245, 251 (3d Cir.1996). Thus, a finding of insufficiency should "be confined to cases where the prosecution's failure is clear." *United States v. Leon*, 739 F.2d 885, 891 (3d Cir.1984).

*United States v. Smith*, 294 F.3d 473, 476–77 (3d Cir. 2002). The Third Circuit has long advised that, in considering a post-verdict judgment of acquittal, the court "must uphold the jury's verdict unless no reasonable juror could accept the evidence as sufficient to support the defendant's guilt beyond a reasonable doubt." *United States v. Fattah*, 914 F.3d 112, 183 (3d Cir. 2019) (citing *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987)). In *United States v. Tyler*, 956 F.3d 116 (3d Cir. 2020), the Circuit Court elaborated on the well-recognized standard:

> This review is "highly deferential" to the factual findings of the jury, and we "must be ever vigilant ... not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc) (alteration and omission in original) (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)).

> Thus, even if the evidence adduced is consistent with multiple possibilities, our role as a reviewing court is to uphold the jury verdict ... as long as it passes the bare rationality test. Reversing the jury's conclusion simply because another inference is possible—or even equally plausible—is inconsistent with the proper inquiry for review of sufficiency of the evidence challenges, which is that [t]he evidence does not need to be inconsistent with every conclusion save that of guilt if it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt. It is up to the jury—not the district court judge or our Court—to examine the evidence and draw inferences. Unless the jury's conclusion is irrational, it must be upheld.

*Id.* at 433 (alteration in original) (internal quotation marks and citation omitted).

*Tyler*, 956 F.3d at 122–23.

Count I of the Indictment charged Defendant with Attempted Bank Fraud under the Bank Fraud statute in violation of federal law under 18 U.S.C. § 1344(1), 18 U.S.C. § 1344(2), and 18 U.S.C. § 1349.  The Indictment stated that Defendant

> knowingly executed and attempted to execute a scheme and artifice to defraud and to obtain the moneys, funds, credits, assets, and other property owned by and under the custody and control of Fidelity Bank, a financial institution whose deposits were insured by the Federal Deposit Insurance Corporation, by means of material false and fraudulent pretenses, representations and promises.

(Doc. 1 at 1.)   The Indictment identifies the following "Execution of the Scheme":

> On or about August 7, 2017, in Wilkes-Barre, Pennsylvania, DORY L. SATER filed and caused to be filed with the Luzerne County Recorder of Deeds, a forged and fraudulent Mortgage Satisfaction Piece that stated falsely that a $50,000 mortgage held by Fidelity Bank was satisfied and discharged in full.

(Doc. 1 at 2.)

5

To find Defendant guilty of violating 18 U.S.C. § 1344(1), the Court instructed the jury that it had to find that the Government proved each of the following three elements beyond a reasonable doubt: 1) Defendant knowingly executed a scheme or artifice to defraud Fidelity Deposit and Discount Bank by means of material false or fraudulent pretenses, representations or promises as detailed in Count 1 of the indictment; 2) Defendant did so with the intent to defraud Fidelity Deposit and Discount Bank; and 3) Fidelity Deposit and Discount Bank was then insured by the Federal Deposit Insurance Corporation.

The Court further instructed the jury that "[t]he first element that the government must prove beyond a reasonable doubt is that Dory Sater knowingly devised a scheme to defraud Fidelity Deposit and Discount Bank of something of value by materially false or fraudulent pretenses, representations or promises." (Doc. 114 at 113:23-114:2.)   As to the second element, the Court instructed that the Government must prove beyond a reasonable doubt that Defendant acted with the intent to defraud Fidelity Deposit and Discount Bank, explaining that

> [t]o act with an "intent to defraud" means to act knowingly and with the intention or the purpose to deceive or to cheat.
>
> In considering whether Dory Sater acted with an intent to defraud, you may consider, among other things, whether Dory Sater acted with a desire or purpose to bring about some gain or benefit to himself or someone else at the expense of Fidelity Deposit and Discount Bank or with a desire or purpose to cause some loss to Fidelity Deposit and Discount Bank.

(Doc. 114 at 116:12-21.)

6

To find Defendant violated 18 U.S.C. § 1344(2), the Court instructed the jury that it had to find beyond a reasonable doubt that Defendant knowingly executed a scheme to obtain the money, funds or other property owned by or under the control of Fidelity Deposit and Discount Bank by means of material false or fraudulent pretenses, representations or promises as detailed in Count 1 of the indictment; and, second, that Fidelity Deposit and Discount Bank was then insured by the Federal Deposit Insurance Corporation. (Doc. 114 at 117:8-18.)

### 1. Need for Expert Testimony or Judicial Notice

Defendant initially argues that under the Bank Fraud statute, 18 U.S.C. §§ 1344(1) and 1344(2), the Government was required to prove that Defendant stood to gain from his conduct at Fidelity's expense or otherwise put Fidelity at risk of loss or diminishment of its rights in relation to money or property and the Government failed to do so. (Doc. 117 at 5-7, 9-16.) Defendant maintains that these issues involve questions of law which required either judicial notice or expert testimony for the jury to understand relevant principles of Pennsylvania law such as whether the unauthorized filing of a mortgage satisfaction piece has the effect of extinguishing a debt, releasing a mortgage, or discharging a lien as between the mortgagor and mortgagee and between the mortgagee and *bona fide* purchasers. (*Id.* at 9-12.) Defendant concludes that, without either judicial notice or expert testimony on these aspects of Pennsylvania law, "the jury had no reasonable basis upon

which to conclude that Mr. Sater or his parents stood to gain at Fidelity's expense from his

unauthorized filing." (*Id.* at 10.)

Contrary to Defendant's assertion, the question before the jury was not whether the

debt was extinguished, the mortgage was released, the lien was discharged, or whether

Defendant or his parents stood to gain at Fidelity's expense. Under § 1344(1) the question

was whether Defendant intended to deprive Fidelity of "something of value," and Defendant

has presented no cogent argument that this is a concept confined to the matters of

Pennsylvania law identified. Under § 1344(2) the question was whether Defendant

knowingly executed a scheme to obtain the money, funds or other property owned by or

under the control of Fidelity Bank by means of material false or fraudulent pretenses,

representations or promises. Defendant has not shown that the answer to this question

necessarily hinged on whether the debt would have been extinguished, the mortgage

released, or the lien discharged.

The Government did not have to prove that "Mr. Sater or his parents stood to gain at

Fidelity's expense from his unauthorized filing." (Doc. 117 at 10.) While the Court

instructed the jury that it *could* consider, in deciding whether Defendant acted with an intent

to defraud, whether he "acted with a desire or purpose to bring about some gain or benefit

to himself or someone else at the expense of Fidelity Deposit," this was just one thing that

could be considered and is not an element of the offense. *See supra* p. 6. Moreover, the

risk of loss requirement has been found satisfied even where the scheme is impracticable or

impossible. *See*, *e.g.*, *United States v. Griffin*, 800 F.3d 198, 203 (5th Cir. 2015) (citing *United States v. Church*, 888 F.2d 20, 24, (5th Cir. 1989)). Courts have long held that the risk of loss element of bank fraud can also be satisfied where the institution may have been able to recoup its money under state law. *Id.* (citing *United States v. Hooten*, 933 F.2d 293, 295 (5th Cir. 1991)). In *Shaw v. United States*, ---U.S.---, 137 S. Ct. 462 (2016), the Court noted that the intent to cause the bank financial harm was not diminished although, "due to standard banking practices in place at the time of the fraud, no bank involved in the scheme ultimately suffered any financial loss." 137 S. Ct. at 467. The Court stated that, while the Bank Fraud statute "insist[s] upon 'a scheme to defraud,' [it] demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss." *Id.*

Based on the foregoing principles, the Court concludes that Defendant has not shown that expert testimony or judicial notice was necessary regarding Pennsylvania lien law for the jury to find Defendant guilty of bank fraud. Defendant alternatively asserts that the lay testimony presented by the Government was not sufficient to allow the jury to find him guilty of bank fraud. (Doc. 117 at 12-16.) The Court will now turn to Defendant's remaining arguments regarding each section of the Bank Fraud statute.

## 2.   *18 U.S.C. § 1344(1)*

### a.   **Risk of Loss**

With respect to § 1344(1), Defendant posits that on the issue of whether his conduct exposed Fidelity to risk of loss or diminishment of its rights in relation to money or property

the jury was not presented with evidence that would permit it to do more than improperly "simply assume" a risk of loss.  (Doc. 117 at 20.)

As set out above, *see supra* p. 6, the Court instructed the jury that "[t]he first element that the government must prove beyond a reasonable doubt is that Dory Sater knowingly devised a scheme to defraud Fidelity Deposit and Discount Bank of something of value by materially false or fraudulent pretenses, representations or promises."  (Doc. 114 at 113:23-114:2.)

The foundation of Defendant's position that the jury did not have sufficient evidence to find this element satisfied is citation to statements made by witness Heather Kazinetz regarding her lack of certainty of the legal effect of the fraudulently filed mortgage satisfaction.  (Doc. 117 at 13-14 (citing Day Three Trial Transcript (Doc. 89) at 125:20-24, 132:25-133:3, 133:6-8, 11-12, 17-24, 135:14-16)).)   Defendant's citations are excerpted from cross-examination regarding the purpose of the filing of a mortgage and Ms. Kazinetz's experience with a fraudulently filed mortgage satisfaction piece.  Cross-examination on these subjects began as follows:

> Counsel:  Okay, and then once you get to Luzerne County Courthouse, that just gives notice to other people; correct?
>
> Ms. Kazinetz: Yes.
>
> Counsel: All right.  And there may never be other people who come to rely on what's ever at the courthouse, right? You never know?
>
> Ms. Kazinetz: Never know.

Counsel: You never know, someone might show up, no one shows up, you never know.  Okay, and you talked about how, on your direct, you talked about how you were concerned that once the mortgage satisfaction had been filed, that you might lose your place in line to any of these subsequent comers, anyone who might want to buy the house or anyone who might want to give Mr. Sater another mortgage loan; correct?

Ms. Kazinetz: Yes.

Counsel: And you had a concern, right, as we explained?

Ms. Kazinetz: Yes.

Counsel: But you really didn't look into the basis for that concern; right?

Ms. Kazinetz: Well, I called an attorney to do that.

Counsel: Right, you relied on someone else?

Ms. Kazinetz: Yes.

Counsel: Okay, so you had a thought and a concern, but you hadn't really looked into whether it was well-grounded?

Ms. Kazinetz: Well, when I got the recording receipt of the satisfaction, I knew it was well-grounded, because now I knew it was a recorded satisfaction.  Then, when I got the title search and saw we were not listed on the title search, I also know if a third party would order the same title search, they would also get that same information showing that our mortgage was not outstanding.

So if someone were to give Mr. or Mrs. Sater $100,000 and they would get a deed to their house and Fidelity Bank wouldn't get that money, and it would be a – if it was possible to get that money back would be a very expensive and time-consuming process, I can only imagine, so.

Counsel:  But you didn't look into it, did you?  You assumed all that, but you didn't really look into it?

Ms. Kazinetz:  No, I never had to look into it, no.

Counsel: You thought you didn't have to look into it, you assumed?

Ms. Kazinetz: Right.

(Doc. 89 at 124:10-125:24.)

From this exchange, Defendant derives the conclusion that "Ms. Kazinetz testified that the basis of her opinions was that she 'assumed' without actually 'looking into it.'" (Doc. 117 at 13 (quoting Doc. 89 at 125:20-24).) The remainder of Defendant's citations to the record refer to Defendant's counsel's questioning of Ms. Kazinetz when he sought to "recap" her testimony regarding the recorded satisfaction. Defendant's counsel proceeded to verify Ms. Kazinetz's lack of research on the specific issue of fraudulent mortgage satisfaction pieces, the fact that she did not practice law for Fidelity Bank, that she was not an expert in the area of fraudulent mortgage satisfaction pieces, and she had no past practices to rely on with respect to the fraudulent filing of a mortgage satisfaction piece. (Doc. 117 at 13-14 (citing Doc. 89 at 132:25-133:3, 133:6-8, 11-12).)

Though Defendant quotes the transcript in his brief (Doc. 117 at 13-14), he does not do so contextually and much of the specific language quoted is that of Defendant's counsel seeking to elicit a response from Ms. Kazinetz. (See Doc 89 at 132:25-133:23.) For example, Defendant states that Ms. Kazinetz was "indeed 'flying blind' with respect to unauthorized filing of a mortgage satisfaction piece" (Doc. 117 at 14) and the transcript contains the following dialog:

Counsel: So it's not like you had any past practice to rely on to tell you how this all shakes out?

Ms. Kazinetz: That is correct.

Counsel: You were sort of flying blind?

Ms. Kazinetz: Yes.

(Doc. 89 at 133:20-24.)  This excerpt shows that Ms. Kazinetz herself did not say that she

was "flying blind" and there was no "indeed" in the transcript, rather she agreed that she

was "sort of flying blind."  (*Id*.)

When Counsel again sought to confirm that the fraudulent filing was a situation with

which Ms. Kazinetz had not previously been confronted, he stated the following: "You had

an inkling as to what would happen, a belief, but it wasn't based on anything you had

actually verified?"  (Doc. 89 at 133:25-134:1.)  Ms. Kazinetz responded as follows:

> Well, based upon my experience with the mortgages, if you ran a title report
> without a mortgage, you would have no mortgage.  So I was relying on my
> experience with mortgages.  I've never had experience with a fraudulent
> satisfaction, but I've had a lot of experience with mortgages, satisfactions, and
> title searches, so I relied on that experience, but, no, I never had experience
> with fraudulent Mortgage Satisfaction Pieces.

(Doc. 89 at 134:2-9.)  When Defendant's counsel suggested that Ms. Kazinetz's

assessment of the situation was an "unverified" belief, she said that her belief was based on

her experience and "unverified feels like I'm saying there's no basis" when her basis was

her experiences with mortgages in general.  (Doc. 89 at 135:2-13.)

Notably, Ms. Kazinetz attributed her uncertainty regarding the effects of a

fraudulently filed mortgage satisfaction to the fact that she had never had to look into the

precise legal ramifications of a such a filing. (*See*, *e.g.*, Doc. 89 at 125:22.) However, her

lack of certainty of the legal intricacies of the ultimate effect of the fraudulent filing does not

diminish her experience as a vice-president of Fidelity Bank who, at the time of trial, was

Fidelity's Special Assets Manager whose duties include overseeing "Work Outs, Collections,

and troubled loans." (Doc. 88 (Day Two Trial Transcript) at 5:3-6.) Defendant's argument

that Ms. Kazinetz's testimony was "pure speculation" (Doc. 117 at 14) ignores her general

business experience upon which her lay opinion was based. Thus, Defendant's criticism of

Ms. Kazinetz's lack of specific expertise does not negate the jury's entitlement to believe her

assessments regarding the benefits of a secured over unsecured loan and her testimony

about potential problems that could arise as a result of Defendant's fraudulent filing.

The Government maintains that the evidence produced at trial was sufficient for the

jury to find Defendant "guilty of both intending to cause and actually causing risk of loss  to

Fidelity, and at the least attempting to do so." (Doc. 122 at 11.) The Government's

summary of evidence includes the following:

> First, documentation and testimony, primarily from witness John Serafin,
> showed that Sater obtained and drew down a $50,000 line of credit from Fidelity
> Bank. *See* Attachment 5 [Doc. 122-5] at 30-31, 45, 53-54; Attachment 8 [Doc.
> 122-8] at 12, 35. That line of credit was collateralized and secured by filing a
> mortgage on the residence belonging to Sater's parents with the Luzerne
> County Courthouse, which perfected the bank's interest in the collateral in the
> event of a foreclosure. *Id.* at 31, 69, 71, 76-78, 114-15. Multiple witnesses
> described how recording a mortgage secures a bank's lien on a property. *See*
> Attachment 5 [Doc. 122-5] at 52-55, 99, 115; Attachment 6 [Doc. 122-6] at 4-5;
> Attachment 9 [Doc. 122-9] at 70-71.

Critically, the Fidelity Bank witnesses were clear that the mortgage was a thing of value to the bank, and that the line of credit would not have been issued without the collateral, given Sater's lack of personal assets. *See* Attachment 5 [Doc. 122-5] at 13 -14, 34 , 49, 114; Attachment 8 [Doc. 122-8] at 83, 143. Indeed, those witnesses repeatedly stressed the importance of collateral in Fidelity Bank's decisions on whether to issue lines of credit, including Sater's, so that the bank could seek to recoup losses from a defaulted loan. *See* Attachment 5 [Doc. 122-5 at 10, 26; Attachment 7 [Doc. 122-7] at 26. The witnesses explained that a loan lacking collateral—referred to as an unsecured loan—put the bank at greater risk in its ability to collect. *See* Attachment 5 [Doc. 122-5] at 10-11, 13-14; Attachment 8 [Doc. 122-8] at 30-32.

Second, the United States introduced evidence, including Sater's own recorded statement, showing that he filed a forged mortgage satisfaction with the Luzerne County Recorder of Deeds. *See* Attachment 4 [Doc. 122-4] at 13-14. During that confession, Sater explained that he filed the forged document because his parents "were thinking at the time of moving," and wanted their residence unencumbered. *Id.* at 15. The filing of the forged mortgage satisfaction piece created the false appearance that Fidelity Bank's mortgage was paid off. *See* Attachment 6 [Doc. 122-6] at 15; Attachment 8 [Doc. 122-8] at 78-79. The jury also heard that Sater subsequently directed his father to send the forged mortgage satisfaction to Fidelity Bank. *See* Attachment 8 [Doc. 122-8] at 47; Attachment 9 [Doc. 122-9] at 25, 28, 53.

Third, Fidelity Bank witness Heather Kazinetz testified that upon receiving the forged mortgage satisfaction from Sater's father, she ordered a title search on the residence. *See* Attachment 8 [Doc. 122-8] at 57, 80. She subsequently saw, in the title search report, that although it referenced a line of credit and lien on the residence held by PNC Bank, Fidelity Bank's line of credit was absent. *Id.* at 80-82. Kazinetz also filed an internal security report to put the bank on notice of a potential loss of $50,000. *Id.* at 85-86.

Kazinetz explained that she took those steps, because the recording of the forged mortgage satisfaction removed Fidelity Bank's lien on the collateralized residence. *Id.* at 78, 149. That testimony echoed Sater's own explanation for why he filed it. Kazinetz also testified that had someone purchased or refinanced the residence and run a title search, they would be unaware of the obligation to repay Fidelity's mortgage, thus rendering the line of credit an unsecured loan. *Id.* at 79, 143, 147-48. In expressing her concern

that the forged mortgage satisfaction put Fidelity Bank at risk, Kazinetz testified that she "believed our mortgage lien was now removed from the property and we didn't have a secured position for our collateral." *Id.* at 79.

Even when challenged about the bases for those concerns on cross-examination, Kazinetz explained that she confirmed the forged mortgage satisfaction was recorded, and that the title search no longer reflected the existence of Fidelity's mortgage. *Id.* at 125, 133-34, 146-47. Thus, even if the bank could recover its collateral, had the property been sold or refinanced while the forged satisfaction was in place, it would be expensive and time-consuming. *Id.*

That testimony was echoed by the other Fidelity witness, John Serafin. Serafin addressed the mortgage filed at the Luzerne County Courthouse on the collateral residence, stating "it is important to know that, first, the bank has a lien on the property, and that second, that lien has not been interrupted or cancelled, in any way shape or form, during the outstanding term of the loan." Attachment 5 [Doc. 122-5] at 79.

Fourth, Kazinetz described how, upon receiving the confirmation that Fidelity's lien on the collateral residence—the thing of value to the bank—was not secure, she sought assistance from the bank's outside counsel, Joseph Joyce. *See* Attachment 8 [Doc. 122-8] at 58, 91, 146. Kazinetz and Joyce both testified that he petitioned the state court to strike the fraudulent mortgage satisfaction piece and reinstate the mortgage, and was ultimately successful. *See id.* at 94; Attachment 9 [Doc. 122-9] at 86-88; Attachment 10 [Doc. 122-10]. Kazinetz further testified that Fidelity Bank, despite ultimately having the line of credit paid off, did in fact incur financial losses in the legal fees accrued to remedy Sater's actions. *See* Attachment 8 [Doc. 122-8] at 96.

(Doc. 122 at 11-15.)

Based on the cited evidence, the Government concludes that the jury had multiple

avenues by which to convict Defendant of bank fraud. (Doc. 112 at 5.) Defendant does not

argue that the Government's review of evidence is inaccurate but rather disagrees with the

Government's conclusion that the evidence is sufficient, asserting that no rational trier of

fact could infer Defendant's guilt from the facts identified, the "essential flaw" being "the great weight the government places upon the testimony of Heather Kazinetz" regarding the impact of the fraudulent filing. (Doc. 126 at 2.)

The Court does not concur with Defendant on the issue of whether the jury could properly rely on Ms. Kazinetz's testimony regarding loss. Rather, at the close of the Government's case, upon consideration of Defendant's assertion that the Government had not introduced sufficient evidence to permit the inference that Defendant had exposed Fidelity to an actual risk of loss, the Court determined that risk of loss was a question of fact for the jury and the Government had presented sufficient evidence for the jury to decide the issue. (Doc. 113 at 145:21-146:25.)

Defendant has presented no argument to undermine the Court's determination at that time that Ms. Kazinetz had offered testimony from which reasonable jurors could find that Defendant's conduct presented an actual risk of loss to Fidelity.[1] As the Government

---

[1] By way of example, the Court cited Ms. Kazinetz's testimony quoted previously in the text, *see supra* p. 11.

> Well, when I got the recording receipt of the satisfaction, I knew it was well-grounded, because now I knew it was a recorded satisfaction. Then, when I got the title search and saw we were not listed on the title search, I also know if a third party would order the same title search, the would also get that same information showing that our mortgage was not outstanding.

> So if someone were to give Mr. or Mrs. Sater $100,000 and they would get a deed to their house and Fidelity Bank wouldn't get that money, and it would be a – if it was possible to get that money back would be a very expensive and time-consuming process, I can only imagine, so.

(Doc. 125:8-19.)

posits, based on Defendant's statement to investigators that his parents wanted their home

released from the mortgage and he filed the mortgage satisfaction because they were

thinking of moving (Doc. 122-4 at 14), the jury had sufficient evidence to believe that he filed

the mortgage satisfaction "with the understanding, expectation, and intent to put the bank at

risk of losing a thing of value—the recorded mortgage—and the intent to deceive the bank

into believing that its loan was secure." (Doc. 122 at 16.) Defendant presents no authority

to support a conclusion that a recorded mortgage is not a thing of value for purposes of the

Bank Fraud statute.

Further, with Ms. Kazinetz's testimony that the recorded mortgage protected the

bank's collateral, the jury was entitled to find that the lack of protection caused by the

fraudulent satisfaction filing created a risk of loss to the bank. Based on her banking

experience, Ms. Kazinetz created a scenario where the bank was placed at risk of loss, *see*

*supra* p. 11, 17 n.1, and such testimony has been found sufficient to satisfy the Bank Fraud

statute's risk of loss requirement. *See, e.g., Griffin*, 800 F.3d at 204.[2] As discussed

---

[2] In *Griffin*, the Court of Appeals for the Fifth Circuit explained that

[t]he government elicited testimony from the vice president of operations at Magnolia Federal that it was put at risk of financial loss because of Griffin's fraudulent scheme. And it is easy to imagine a scenario in which Magnolia Federal risked loss. For example, had Magnolia Federal paid the $57,900 check to Griffin's sister before discovering the fraudulent scheme, it might be accountable for that money because, as the Magnolia Federal official testified, it was required to return the funds in the Jenkins account that were transferred from Bank of America Merchant Services. *Cf. United States v. Nelson,* 242 Fed. Appx. 164, 173 (5th Cir.2007) (holding that defendant subjected transferee bank to risk of loss where defendant had withdrawn fraudulently deposited funds by the time transferor bank demanded that

previously, the risk of loss requirement has also been found satisfied where the scheme is impracticable or impossible, *Church*, 888 F.2d at 24, where the institution might have been able to recoup its money under state law, *Hooten*, 933 F.2d at 295, and where banking practices prevented the bank from ultimately suffering financial loss, *Shaw*, 137 S. Ct. at 467. *Shaw* also discussed the viability of a fraud claim where a bank is "deprived of its right to use the property, even if it ultimately did not suffer unreimbursed loss." *Id.*

Here, if Defendant's parents sold their house with no mortgage recorded, the Government produced sufficient evidence for a jury to conclude that Defendant's scheme put Fidelity at risk of being deprived of its right to use its property interest in Defendant's parents' house even if the deprivation was temporary and Fidelity's lien position was ultimately recognized and/or restored. In other words, based on Ms. Kazinetz's testimony and common sense, the jury could have concluded that if a transaction occurred between Defendant's parents and a homebuyer, Defendant's parents would be in possession of $50,000 that was Fidelity's collateral for the line of credit and Fidelity would have had to do something to be paid that amount.

---

transferee bank return those funds).

800 F.3d at 204. This excerpt indicates that a bank vice president was properly allowed to testify about risk of loss and, from the testimony, a jury could properly draw inferences about a scenario in which the banking institution risked loss.

In sum, based on the evidence presented at trial and the broad contours of the risk-of-loss concept employed by courts interpreting the Bank Fraud statute, Defendant's argument that acquittal is required based on insufficient evidence of risk of loss is without merit.  Having reviewed the record in the light most favorable to the prosecution and drawn all reasonable inferences in favor of the jury's verdict, the Court finds that "a rational trier of fact could have found proof beyond a reasonable doubt on the available evidence," *Wolfe*, 245 F.3d at 262, to conclude that Defendant's conduct exposed Fidelity to a risk of loss.

### b.    Intent to Deceive and Nature of Misrepresentation

Defendant further maintains that, under § 1344(1), the Government failed to prove that he attempted to deceive Fidelity in that the Government failed to present evidence that would have permitted the jury to find beyond a reasonable doubt that he directed a misrepresentation to Fidelity or intended to deceive the bank.  (Doc. 117 at 17-18.)

As set out above, *see supra* p. 6, the Court instructed the jury that the Government had to prove beyond a reasonable doubt that Defendant acted with the intent to defraud Fidelity Bank and further explained that

> [t]o act with an "intent to defraud" means to act knowingly and with the intention or the purpose to deceive or to cheat.
>
> In considering whether Dory Sater acted with an intent to defraud, you may consider, among other things, whether Dory Sater acted with a desire or purpose to bring about some gain or benefit to himself or someone else at the expense of Fidelity Deposit and Discount Bank or with a desire or purpose to cause some loss to Fidelity Deposit and Discount Bank.

(Doc. 114 at 116:12-21.)

As an initial matter, the Court notes that Defendant's intent to pay off the loan is of no legal significance in the analysis of the intent requirement of § 1344(1) in that the Bank Fraud statute does not require "a showing of intent to cause financial loss," *Shaw*, 137 S. Ct. at 467. As the First and Third Circuits have found, where defendants did not specifically intend to cause the bank a loss because they intended that the loans at issue would be repaid, the defendants' intent to make misrepresentations that made a loss more likely satisfied the specific intent requirement of § 1344(1). *United States v. Khorozian*, 333 F.3d 498, 505 (3d Cir. 2003), *abrogated in part on other grounds by Loughrin v. United States*, 537 U.S. 351 (2014); *United States v. Moran*, 312 F.3d 480, 491 (1st Cir. 2003).

Defendant first asserts that the Government's "theory of the case was that 'the second he filed the forged Mortgage Satisfaction, Dory Sater committed bank fraud,'" and the Government presented no evidence that he "could have intended or believed that the very act of filing . . . would deceive Fidelity." (Doc. 117 at 18 (quoting Doc. 114 at 29:24-30:6).) Defendant bases this assertion on Ms. Kazinetz's testimony that the fraudulent filing did not come to her attention until Defendant's father faxed her a copy of it more than six months after it was filed and on testimony that the Luzerne County Recorder of Deeds does not mail copies of mortgage satisfactions to banks. (*Id.*) Defendant concludes that

> [b]ased on the testimony, and the absence of evidence suggesting that Mr. Sater believed his misrepresentation (the mortgage satisfaction piece) would reach and deceive Fidelity at the time he filed, the jury had no basis upon which to conclude that Mr. Sater intended to deceive Fidelity. Thus, the government's proof cannot withstand a motion for a judgment of acquittal of bank fraud under § 1344(1).

(Doc. 117 at 18-19.)

Defendant frames his intent argument in the context of a statement made by the

Government in closing argument. (*Id*. at 18.)   His assertions on the issue attempt to

foreclose the jury's ability to find intent other than in the strict confines of that statement.

(*Id*.)  This approach to showing evidentiary insufficiency is not consistent with the law or this

Court's instruction to the jury.   First, the law provides that "arguments of counsel are simply

not evidence."  *United States v. Sandini*, 888 F.2d 300, 311 (3d Cir. 1989) (citing *United*

*States v. Vadino*, 680 F.2d 1329, 1336 (11th Cir. 1982)).   Second, the Court instructed the

jury as follows:

> You must make your decision in this case based only on the evidence that you
> saw and heard in the courtroom. . . . The evidence from which you are to find
> the facts consist of the following:
>
> 1.  The testimony of the witnesses.
>
> 2.  Documents and other things received as exhibits.
>
> 3.  Any fact or testimony that was stipulated, that is formally agreed to
>     by the parties.
>
> And the following are not evidence:
>
> 1.  The indictment.
>
> 2.  Statements and arguments of the lawyers for the parties in this case.

(Doc. 114 at 100:6-18.)   The Court also instructed the jury as follows: "Although the lawyers

may have called your attention to certain facts or factual conclusions that they thought were

important, what the lawyers said is not evidence and is not binding on you.  It is your own

recollection and interpretation of the evidence that controls your decision in this case."  (*Id.* at 103:2-6.)

The foregoing shows that Defendant's intent argument is properly rejected because it is premised on an inadequate foundation.  Defendant's argument also fails because there is no statutory requirement as to how or when the misrepresentation comes to the bank's attention under § 1344(1).  As stated above, a defendant's intent to make misrepresentations that made a loss more likely satisfies the specific intent requirement of § 1344(1).  *Khorozian*, 333 F.3d at 505.  There is no dispute that Defendant intended to file the fraudulent mortgage satisfaction piece.  Using the appropriate standard, the Court's review of the record shows that the jury had ample evidence to find proof beyond a reasonable doubt that Defendant intended to deceive the bank.

Because the Court has also determined that the Government presented evidence from which it could reasonably be concluded that Defendant's conduct exposed Fidelity to a risk of loss, *see supra* p. 20,  the Court concludes, after reviewing the record in the light most favorable to the prosecution and drawing all reasonable inferences in favor of the jury's verdict, that "a rational trier of fact could have found proof beyond a reasonable doubt on the available evidence," *Wolfe*, 245 F.3d at 262, to convict Defendant under § 1344(1). Therefore, the Court will deny Defendant's Motion for a Judgment of Acquittal as to his 18 U.S.C. § 1344(1) conviction.

3.   *18 U.S.C. § 1344(2)*

With respect to § 1344(2), Defendant posits that on the element of scheming to obtain money or property the Government did not present sufficient proof for the jury to convict on this count.  (Doc. 117 at 14-15, 19.)

To find Defendant guilty of violating § 1344(2), the Government had to prove beyond a reasonable doubt that he knowingly devised a scheme "to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1344(2).

Defendant's argument is twofold.  First, the Government did not show that Defendant schemed to obtain money or property of the bank.  (Doc. 117 at 14-15.)  Second, the Government did not show that Defendant used a false statement that would naturally induce Fidelity to part with its money or property.  (Doc. 117 at 19-20.)  The Court will address each basis for acquittal.

a.   **Scheme to Obtain Money or Property**

The foundation of Defendant's argument that the Government did not present sufficient evidence to show that Defendant devised a scheme to obtain the bank's money or property, as with § 1344(1), is his assertion that Ms. Kazinetz's allegedly flawed testimony could not do anything more than allow the jury to improperly speculate on the issue of whether the scheme had to do with the bank's money or property.  (*See* Doc. 117 at 14-15;

see also Doc. 126 at 6-8.)   Because the Court has determined that Ms. Kazinetz's testimony was properly considered by the jury in its determination of guilt on § 1344(1), the Court finds that the premise on which Defendant builds his § 1344(2) argument does not support a conclusion that he should be acquitted on this count.

Defendant recognizes Fidelity's mortgage interest in Defendant's parents' house is Fidelity's property but asserts the jury could not conclude that his fraudulent filing impacted this interest "by, for example extinguishing the Sater's mortgage obligations or invalidating Fidelity's lien" because the jury would have had to rely on Ms. Kazinetz's testimony to so find.  (Doc. 126 at 7.)  With the assertion, Defendant again ignores the fact that the ultimate outcome of the scheme is not at issue, see supra pp. 8-9,  and a scheme to even temporarily obtain Fidelity's property, such as would arguably be the situation if Defendants' parents' house were sold and the bank was not paid the $50,000 owed upon the sale of the house (a scenario discussed by Ms. Kazinetz, see supra pp. 11, 17 n.1), can be sufficient to establish a scheme for purposes of § 1344, see supra p. 19.

For these reasons, the Court concludes that Defendant has failed to show that the jury had insufficient evidence to find that Defendant devised a scheme to obtain the bank's money or property pursuant to § 1344(2).  Rather, viewing the record in the light most favorable to the prosecution and drawing all reasonable inferences in favor of the jury's verdict, the Court finds that "a rational trier of fact could have found proof beyond a

reasonable doubt on the available evidence," *Wolfe*, 245 F.3d at 262, that Defendant

schemed to obtain the bank's property under § 1344(2).

  **b.** **By Means of False or Fraudulent Pretenses, Representations, or Promises**

  Defendant argues that the Government did not offer sufficient evidence to prove that

Defendant's false or fraudulent pretenses, representations or promises naturally induced

Fidelity to part with its money or property.  (Doc. 117 at 23.)  On this point, Defendant

argues as follows:

> In *Loughrin*, the Court held that § 1344(2) does not require the government to show that a defendant intended to deceive a bank, but further held that § 1344)) "demands that the defendant's false statement is the mechanism naturally inducing a bank (or custodian) to part with its money." *Loughrin*, 573 U.S. at 355-57, 365.
>
>   The basis for acquittal here is the same as above. In short, Mr. Sater's filing would cause Fidelity to 'part with its money' only if the government is correct that the filing "turn[ed] [Mr. Sater's line of credit]into an unsecured loan, without any underlying collateral," "removed Fidelity's lien on the property," and exposed Fidelity to the "risk that, if the Sater's home had been sold or encumbered, Fidelity would not have been paid or Fidelity would have lost its lien position."  In support of these propositions, the government relied on the testimony of Ms. Kazinetz, which carries little to no weight, even when viewed in the light most favorable to the government. Here again, the government's proof cannot withstand a motion for a judgment of acquittal of bank fraud under § 1344(2).

(Doc. 117 at 19-20.)

  In *Loughrin*, the Court addressed the question of whether § 1344(2) required the

Government to show that a defendant intended to defraud a federally insured bank or other

financial institution and concluded that it did not, agreeing with the decision of the Tenth

Circuit that intent is relevant only under § 1344(1).  573 U.S. at 355.  The Court stated that §

1344(2) "covers property 'owned by' the bank but in someone else's custody and control

(say, a home that the bank entrusted to a real estate company after foreclosure); thus, a

person violates § 1344(2)'s plain text by deceiving a non-bank custodian into giving up bank

property that it holds."  573 U.S. at 357.

The Court addressed the "by means of" requirement of § 1344(2) in the context of

the defendant's argument that, without an intent requirement, the "by means of" language

would sweep too far and would cover run-of-the-mill frauds properly the concern of state

courts.  *Id.* at 365-66.  The Court provided the following example of a run-of-the-mill fraud

where the bank's involvement in the scheme is wholly fortuitous and would not be covered

by the bank fraud statute because it does not satisfy the "by means of" requirement: where

a buyer of a fake designer handbag pays the fraudster by check, the handbag seller's false

pretense has nothing to do with the bank that would cash it.  *Id.* at 365.  *Loughrin* then

stated that § 1344(2) "demands that the defendant's false statement is the mechanism

naturally inducing a bank (or custodian) to part with its money.  And in cases like the

handbag swindle, where no false statement will ever go to a financial institution, the fraud is

not the means of obtaining bank property."  *Id.* at 365.  The Court reiterated that the text of

the provision limits its scope to deceptions that have some real connection to a federally

insured bank, and thus implicate the pertinent federal interest.  *Id.* at 366 (citing S. Rep. No.

98-225, at 378 (noting the federal "jurisdiction is based on the fact that the victim of the

offense is a federally controlled or insured institution")).

Upon criticism in Justice Scalia's dissent that the majority's "by means of" analysis

was not necessary and better left for another day,[3] the Court further addressed the "by

means of" requirement in a footnote:

> [t]he "by means of" phrase calls for an inquiry into the directness of the
> relationship between means and ends, not the fraudster's subjective intent. . .
> . Language like "by means of" is inherently elastic: It does not mean one thing
> as to all fact patterns—and certainly not in all statutes, given differences in
> context and purpose. All we say here is that the phrase, as used in § 1344(2),
> is best read, for the federalism-related reasons we have given, see *supra,* at
> 2391 – 2393, as drawing a line at frauds that have some real connection to a
> federally insured bank—namely, frauds in which a false statement will naturally
> reach such a bank (or a custodian of the bank's property).

573 U.S. at 365 n.8.

---

[3]  Justice Scalia began his dissent by stating that he agreed that neither intent to defraud a bank nor exposure of a bank to a risk of loss is an element of the crime codified in 18 U.S.C. § 1344(2). He then stated

> I am *dubitante* on the point that one obtains bank property "by means of" a fraudulent statement only if that statement is " the mechanism naturally inducing a bank (or custodian of bank property) to part with money in its control," *ante,* at 2393. The Government suggested that test, but only briefly claimed it was to be found in the "by means of" language, Brief for United States 40–41—so briefly that Loughrin responded that "[t]he Government does not claim any textual basis for this [naturally inducing] rule," Reply Brief 13. We have heard scant argument (nothing but the Government's bare-bones assertion) in favor of the "by means of" textual limitation, and no adversary presentation whatever opposing it. The Court's opinion raises the subject in order to reply to Loughrin's argument that, unless we adopt his proposed nontextual limitations, all frauds effected by receipt of a check will become federal crimes. It seems to me enough to say that Loughrin's solutions to the problem of the statute's sweep are, for the reasons well explained by the Court's opinion, not correct. What the proper solution may be should in my view be left for another day.

573 U.S. at 367 (Scalia, J., dissenting).

Given the unique fact-pattern of the case now before the Court, the guidance provided in *Loughrin*, and Defendant's failure to provide a cohesive argument on the issue of the effect of Defendant's fraudulent filing in this case (*see* Doc. 117 at 19-20), the Court concludes that Defendant has not met his "very heavy burden" of showing that the Government did not proffer sufficient evidence for the jury to have convicted him under § 1344(2).

As to Defendant's argument, in addition to finding it conclusory and disjointed, the Court finds that Defendant presents a hypothetical which would in fact, given the Court's previous determinations, have allowed the jury to find the necessary relationship between the false statement and Fidelity's money or property. Defendant states that "Mr. Sater's filing would cause Fidelity to 'part with its money' only if the government is correct that the filing . . . exposed Fidelity to the 'risk that, if the Sater's home had been sold . . . Fidelity would not have been paid.'" (Doc. 117 at 20.) Seen in the context of the Court's finding that such a scenario created a risk of loss because even a temporary deprivation of the use of the bank's property (collateral) was sufficient, *see supra* p. 19, Defendant's quoted scenario would be a situation where the jury could find reasonably that Defendant's filing would cause Fidelity to part with its property.

Further, this is not a case where "no false statement would ever go to a financial institution." *Loughrin*, 573 U.S. at 365. Here, in *Loughrin* terms, the false statement would have naturally gotten to the financial institution if Defendant's parents sold their house and

the bank sought to foreclose on the mortgage due to lack of payment on the line of credit.[4] Importantly, *Loughrin's* direction that the text of the § 1344(2) "limits its scope to deceptions that have some real connection to a federally insured bank, and thus implicate the pertinent federal interest," 573 U.S. at 366, indicates that the unusual fact pattern of this case should not be excluded from consideration under the provision in that here there is no question that Defendant's deception has "some real connection to a federally insured bank."

Under Ms. Kazinetz's scenario previously discussed, Defendant's fraudulent mortgage satisfaction could have allowed Defendant's parents to sell their house (as he believed was their intent when he filed the mortgage satisfaction (Doc. 122-4 at 15:16-17) without Fidelity being paid the $50,000 it had loaned Defendant under the line of credit secured by the mortgage on the house. Defendant has not shown, and the Court does not conclude, that *Loughrin* precludes this scenario from providing a basis for a conviction under § 1344(2). Because § 1344(2) "covers property 'owned by' the bank but in someone else's custody and control," the collateral in the home "owned by" the bank, i.e., the $50,000 mortgage, could be construed to be under the parents' control and, if the parents sold their house, they, too, would have been deceived by the false filing into giving up bank property.

---

[4] Although the false statement got to the banking institution when Defendant directed his father to send a copy of the false mortgage satisfaction piece to the bank (Doc. 89 at 49-50, Doc. 113 at 25:22-25), testimony did not establish that it "naturally" reached the bank in *Loughrin* terms. (*See* Doc. 113 at 25-28.) However, when Ms. Kazinetz responded "[n]o" to the question of whether she had any reason to believe that she would have learned about the forged satisfaction piece if Joseph Sater had not faxed it, the foreclosure scenario was not discussed. (*See* Doc. 89 at 58:4-9.) Later, Ms. Kazinetz testified that a title search would and did reveal that the bank's mortgage was not recorded and the resulting inquiry would lead to the discovery of the forged mortgage satisfaction piece. (*See, e.g.*, Doc. 89 at 81:8-84:6.)

Even if that property (the $50,000) could be recouped under principles of state lien law, the temporary nature of the deprivation does not shelter a defendant from liability.  *Shaw*, 137 S. Ct. at 467.

In sum, Defendant has failed to satisfy his burden of showing that the jury did not have a basis to find that his false statement induced Fidelity to part with its money or property.  Rather, viewing the record in the light most favorable to the prosecution and drawing all reasonable inferences in favor of the jury's verdict, the Court finds that "a rational trier of fact could have found proof beyond a reasonable doubt on the available evidence," *Wolfe*, 245 F.3d at 262, that Defendant's false statement satisfied the statutory "by means of" requirement under § 1344(2).  Because the Court previously determined that the jury had ample evidence to find that Defendant schemed to obtain the bank's property under § 1344(2), *see supra* pp. 25-26, the Court concludes that the jury's finding of guilt under § 1344(2) passes the "bare rationality test" judging sufficiency of the evidence, *Tyler*, 956 F.3d at 123, such that the verdict should stand.  Therefore, the Court will deny Defendant's Motion for a Judgment of Acquittal as to his 18 U.S.C. § 1344(2) conviction.

With this finding, Defendant's Motion for a Judgment of Acquittal (Doc. 110) will be denied on Counts 1 and 2 of the Indictment.  As to Count 1, the Court has found that the Government produced sufficient evidence for the Court to find Defendant guilty under the Bank Fraud statute, 18 U.S.C. §§ 1344(1) and 1344(2).  Because his motion as to Count 2

regarding his conviction for aggravated identity theft is dependent on acquittal of Count One (*see* Doc. 117 at 1-2), the Motion will also be denied as to Count Two.

## B.   <u>Motion for a New Trial</u>

With his Motion for a New Trial (Doc. 111), Defendant seeks a new trial on Counts 1 and 2 of the Indictment.  (*Id.* at 2.)  He contends that justice requires a new trial because the Government convicted him "using evidence inadmissible for the purpose of establishing the impact of his conduct on the interests of the bank" and the Government convicted him "using weightless and potentially misleading evidence."  (Doc. 118 at 1.)

Rule 33 of the Federal Rules of Criminal Procedure provides in pertinent part that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment."  Fed. R. Crim. P. 33(a).

> "Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Johnson,* 302 F.3d 139, 150 (3d Cir.2002). However, even if a district court believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial "only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *Id.* (citation and quotation marks omitted). . . . Such motions are not favored and should be "granted sparingly and only in exceptional cases." *Gov't of Virgin Islands v. Derricks,* 810 F.2d 50, 55 (3d Cir.1987) (citations omitted).

*United States v. Silveus*, 542 F.3d 993, 1004–05 (3d Cir. 2008).

"The discretion that federal trial courts exercise in addressing allegations of juror and
prosecutorial misconduct extends to the determination of whether prejudice has been
demonstrated." *United States v. Smith*, 139 F. App'x 475, 477 (3d Cir. 2005) (citing *United
States v. Resko,* 3 F.3d 684, 690 (3d Cir.1993)). Exceptional cases include those in which
trial errors "so infected the jury's deliberations that they had a substantial influence on the
outcome of the trial." *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993) (citation
omitted). In this inquiry, the district court should consider the combined effect of claimed
errors. *United States v. Hoffecker*, 530 F.3d 137, 168 (3d Cir. 2008). The defendant "bears
the burden of persuading the trial court that the interest of justice requires the grant of a new
trial." *United States v. Ray*, No. 1:12-CR-58, 2016 WL 5787345, at *3 (M.D. Pa. Oct. 4,
2016) (quoting *United States v. Hammer*, 25 F. Supp. 2d 518, 534 (M.D. Pa. 1998))
(citing *United States v. Amirnazmi*, 648 F. Supp. 2d 718, 719 (E.D. Pa. 2009)).

Before addressing Defendant's specific arguments regarding this motion, the Court
notes that Defendant essentially rehashes the arguments presented in support of his Motion
for a Judgment of Acquittal. For example, Defendant again posits that the Government's
case is wholly contingent on principles of Pennsylvania law (Doc. 118 at 3, 12), a theory
which the Court rejected in consideration of Defendant's Motion for Judgment of Acquittal,
and Defendant again criticizes the admission of Ms. Kazinetz's testimony as improper lay
opinion testimony (*id.* at 12-13), a position the Court also previously rejected.

33

1.      **Evidence Inadmissible for the Purpose of Establishing the Impact of Defendant's Conduct on the Interests of the Bank**

Referring to the testimony of Heather Kazinetz, Defendant contends that "the Court should grant a new trial because the government convicted Mr. Sater using evidence (lay testimony) inadmissible for the purpose of establishing the impact of his conduct on the interests of the bank."[5]  (Doc. 118 at 9.)   The Government responds that Ms. Kazinetz's testimony was based on her personal involvement with Defendant's forged mortgage satisfaction and she "conveyed her factual knowledge as a lay witness."  (Doc. 123 at 4.) The Government added that, to the extent Ms. Kazinetz's "concerns and perceptions included opinions about the facts she personally witnessed, they were based on her extensive experience in the banking industry, and thus permissible under Federal Rule of Evidence 701."  *Id.*

Federal Rule of Evidence 701 provides as follows:

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

**(a)** rationally based on the witness's perception;

**(b)** helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

**(c)** not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

---

[5] Defendant also asserts that "[e]ven assuming (*arguendo*) the lay opinion evidence was admissible for the purpose of, *e.g.*, showing materiality, the Court should have communicated a limiting instruction to the jury."  (*Id.* (citing Fed. R. Evid. 105).)  Defendant does not develop this argument. Therefore, the Court will focus on Defendant's argument regarding inadmissible lay testimony.

Fed. R. Evid. 701. The Advisory Committee Notes to rule 701 pertaining to the 1972 Proposed Rules include a statement of the "traditional objective" of the rule is to put "the trier of fact in possession of an accurate reproduction of the event." The Advisory Committee Notes pertaining to the 2000 amendment to the rule state that testimony of a lay witness is admissible "where it is based on particularized knowledge that the witness has by virtue of his or her position in the business."

Outside the presence of the jury, the Court heard extensive argument on the scope of Ms. Kazinetz's testimony after Defendant's counsel objected to Government counsel's question about what specifically caused her concern when she learned about the fraudulently filed mortgage satisfaction. (Doc. 89 at 59:5-68:4.) The line between lay testimony and expert testimony was discussed in detail with Government counsel asserting that Ms. Kazinetz's testimony was not being offered as that of an expert but rather as a lay witness expressing her concerns about the fraudulent filing based on her banking experience, and Defendant's counsel highlighting the admitted fact that Ms. Kazinetz had no specific experience or personal knowledge regarding forged mortgage satisfaction pieces. (*Id.*) The Court concluded that Defendant's counsel would be given an opportunity to voir dire Ms. Kazinetz regarding the basis for her concerns. (Doc. 89 at 67:18-19.) In doing so, the undersigned stated that, if Government counsel

> questions her in appropriate fashion, such that he lays a foundation for her concern, based on her experience as a bank employee, in the area of collection of debts, lines of credit, security instruments, including liens of mortgages, if he

lays a proper foundation, I'm going to allow her to testify.  But if he goes across the line, I'm going to sustain your objection.

(Doc. 89 at 67:20-68:1.)

Following voir dire, the undersigned found that voir dire had established

we're not dealing with expert testimony. . . . It's clear that [Ms. Kazinetz] is testifying as a Special Assets Manager and vice-president of the bank based on her experience in the various aspects of lines of credit, mortgages, security instruments, and loans. . . . You can certainly cross-examine her to attempt to suggest that her perceptions were incorrect, that the conclusions that she drew from her perceptions were incorrect, but her ability to give her perceptions and her opinion thereon seems to me to be sufficiently well-established by the . . . voir dire.

(*Id.* at 75:20-76:17.)

With his present motion, Defendant has presented no basis to reverse the

determination made at trial.  First, the Court finds Defendant's reliance on *Donlin v. Philips*

*Lighting N. Am. Corp.*, 581 F.3d 73 (3d Cir. 2009), misplaced.  (*See* Doc. 118 at 13-14.)  In

*Donlin*, the Circuit Court found that a temporary warehouse employee's damages testimony

about certain aspects of retirement benefits, present-value discounting, and similar matters,

was not properly admitted because she did not have the type of business knowledge or

tenure necessary to find her testimony reliable under Rule 701's "particularized knowledge"

requirement.  581 F.3d at 81-83.  The Circuit Court also found that the District Court had

erred because it had not satisfied the requirement that "[a] trial judge must rigorously

examine the reliability of a layperson's opinion by ensuring that the witness possesses

sufficient specialized knowledge or experience which is germane to the opinion offered."

581 F.3d at 83 (citing *Asplundh Mfg. Div. v. Benton Harbor Eng'g,* 57 F.3d 1190, 1200–01 (3d Cir.1995)).

In contrast, here the testimony established that Ms. Kazinetz was a long-term executive employee of the bank with a broad range of knowledge on relevant issues. The record also shows that the undersigned rigorously examined the basis of Ms. Kazinetz's testimony and opinions, established what knowledge she possessed based on her particularized knowledge of banking matters at issue, and allowed her testimony for limited purposes. (*See, e.g.,* Doc. 89 at 67:20-68:1, 75:20-76:17.) Further, authority cited by the Government supports the conclusion that Ms. Kazinetz could properly testify about banking matters related to this case and "inferences [she] could draw form [her] perception" of these matters. (Doc. 123 at 8 (citing *United States v. Polishan*, 33 F.3d 234, 242 (3d Cir. 2009)).)

Second, although Defendant maintains that Government counsel made improper use of the testimony in closing argument, as discussed at length above, the Court clearly instructed the jury that statements made by counsel were not to be considered evidence. *See supra* pp. 21-22. Defendant's counsel extensively cross-examined Ms. Kazinetz and established that her concerns were not legal opinions and were based on her general experience rather than on specific experience regarding fraudulently filed mortgage satisfaction pieces. *See supra* pp. 10-13. The Court specifically determined that Ms. Kazinetz's testimony could properly be considered by the jury on the risk of loss issue. *See supra* p. 17. Under the Rule 33 standard where the Court exercises its own judgment in

assessing the Government's case,  *Johnson*, 302 F.3d at 150, the undersigned does not

believe the jury verdict is contrary to the weight of the evidence based on the lay testimony

admitted at trial.

**2.    *Use of Weightless and Potentially Misleading Evidence***

With his assertion that a new trial is warranted because the Government convicted

him "using weightless and potentially misleading evidence," Defendant again maintains that

a definitive statement of Pennsylvania law was required either in the form of judicial notice

or expert testimony and Ms. Kazinetz's testimony was not sufficient to support a conviction

under the  Bank Fraud statute.  (Doc. 118 at 18-23.)   The Court rejected these arguments

in the context of Defendant's Motion for a Judgment of Acquittal.  *See supra* pp. 7-19.  The

Court finds that Defendant has presented no basis upon which to conclude differently in the

context of his Motion for a New Trial.

In this section of his brief, Defendant references a portion of the standard for a new

trial set out above, stating that "'[a] district court can order a new trial on the ground that the

jury's verdict is contrary to the weight of the evidence,' if the court 'believes that there is a

serious danger that a miscarriage of justice has occurred,' *i.e.*, 'that an innocent person has

been convicted.'"  (Doc. 118 at 18 (quoting *United States v. Johnson*, 302 F.3d 139, 150 (3d

Cir. 2002)).)  Defendant fails to present any argument that he is an innocent person who

has been convicted.  Here the Court has no basis to conclude that this is an exceptional

case where an innocent person has been convicted.  Therefore, considering the combined

effects of Defendant's claimed errors, the Court finds no basis to grant his Motion for a New Trial.

### III. CONCLUSION

For the reasons discussed above, Defendant's Motion for a Judgment of Acquittal (Doc. 110) and Motion for a New Trial (Doc. 111) will be denied.  A separate Order is filed simultaneously with this Memorandum Opinion.

_____

Robert D. Mariani
United States District Judge